UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

                Plaintiff,         Case No. 24-cr-20233

v.                                 Judith E. Levy
                                   United States District Judge

Norman Washington Spence,

                                  Mag. Judge Kimberly G. Altman

                Defendant.

_____/

**OPINION AND ORDER DENYING
DEFENDANT'S MOTION TO DISMISS THE INDICTMENT [38]**

Before the Court is a motion to dismiss the indictment filed by Defendant Norman Washington Spence. (ECF No. 38.) The motion is fully briefed.[1] (ECF Nos. 40, 42.) For the reasons set forth below, Defendant's motion is DENIED.

## I.    Background

A one-count indictment filed on May 1, 2024 charges Defendant with being an alien in possession of ammunition, in violation of 18

---

[1] On October 30, 2024, the Court issued a notice that the motion will be decided without oral argument under Eastern District of Michigan Local Rule 7.1(f)(2). (ECF No. 39.)

U.S.C. § 922(g)(5)(A).[2] (ECF No. 12.) The indictment alleges that Defendant possessed ammunition "knowing that he was an alien illegally and unlawfully in the United States." (*Id.* at PageID.17.) Defendant pled not guilty on May 3, 2024.

On October 22, 2024, Defendant filed a motion to dismiss the indictment based on the Second Amendment. (ECF No. 38.) He argues that § 922(g)(5)(A) is "unconstitutional both facially and as applied to him" under *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). (ECF No. 38, PageID.118–119.) The government opposes the motion. (ECF No. 40.)

---

[2] Section 922(g)(5)(A) provides:

> It shall be unlawful for any person . . . who, being an alien . . . is illegally or unlawfully in the United States . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(5)(A).

## II. Legal Standard

### A. Federal Rule of Criminal Procedure 12(b)(1)

Under Federal Rule of Criminal Procedure 12(b)(1), "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1).

### B. The Second Amendment

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

In *District of Columbia v. Heller*, the Supreme Court determined that "the Second Amendment conferred an individual right to keep and bear arms" in the home for self-defense. 554 U.S. 570, 595, 628–30, 636 (2008). In reaching this conclusion, the Court pointed out that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626. "*Heller*'s methodology centered on constitutional text and history." *Bruen*, 597 U.S. at 22. But the Court in *Heller* indicated that it "d[id] not undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment." 554 U.S. at 626.

3

In *McDonald v. Chicago*, the Supreme Court subsequently held that the Second Amendment right to keep and bear arms in the home for self-defense "is fully applicable to the States" through the Fourteenth Amendment. 561 U.S. 742, 750 (2010); *see id.* at 791 ("We. . . hold that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*.").

The Supreme Court later held in *Bruen* that "consistent with *Heller* and *McDonald*, . . . the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Bruen*, 597 U.S. at 10. The Court indicated that, as in *Heller*, it "d[id] not undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment." *Id.* at 31 (quoting *Heller*, 554 U.S. at 626).

In *Bruen*, the Supreme Court addressed the framework that applies to a Second Amendment claim. The Court noted that "[i]n the years since" it decided *Heller* and *McDonald*, "the Courts of Appeals have coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end

scrutiny." *Id.* at 17. The Supreme Court, however, "decline[d] to adopt that two-part approach" in *Bruen*.[3] *Id.* The Court stated that

> the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." *Konigsberg*, 366 U.S. at 50, n.10, 81 S. Ct. 997.

*Id.* at 24. Thus, "[t]he test that [the Supreme Court] set forth in *Heller* and appl[ied] [in *Bruen*] requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 26.

Under *Bruen*, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the

---

[3] In *Bruen*, the Supreme Court found that

> [s]tep one of the predominant [two-step] framework [adopted by appellate courts] is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context.

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 19 (2022); *see id.* at 24 ("[T]he Courts of Appeals' second step is inconsistent with *Heller*'s historical approach and its rejection of means-end scrutiny.").

outer bounds of the right to keep and bear arms." *Id.* at 19 (emphasis omitted); *see United States v. Rahimi,* 602 U.S. 680, 691 (2024) ("[W]hen the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to 'justify its regulation.'" (quoting *Bruen,* 597 U.S. at 24)). "[I]f a challenged regulation fits within th[e Nation's historical] tradition [of firearm regulation], it is lawful under the Second Amendment." *Rahimi,* 602 U.S. at 691. The Supreme Court in *Bruen* instructed courts assessing a Second Amendment claim to consider the "historical tradition" from when the Second Amendment was ratified in 1791. *See Bruen,* 597 U.S. at 34 ("Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*" (emphasis in original) (quoting *Heller,* 554 U.S. at 634–35)).

More recently, the Supreme Court in *United States v. Rahimi* stated that

> some courts have misunderstood the methodology of our recent Second Amendment cases. These precedents were not meant to suggest a law trapped in amber. . . . [T]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791. . . .

6

> As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition. 597 U.S. at 26–31, 142 S. Ct. 2111. A court must ascertain whether the new law is "relevantly similar" to laws that our tradition is understood to permit, "apply[ing] faithfully the balance struck by the founding generation to modern circumstances." *Id.*, at 29, 142 S. Ct. 2111. Discerning and developing the law in this way is "a commonplace task for any lawyer or judge." *Id.*, at 28, 142 S. Ct. 2111.
>
> Why and how the regulation burdens the right are central to this inquiry. *Id.*, at 29, 142 S. Ct. 2111. For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding. And when a challenged regulation does not precisely match its historical precursors, "it still may be analogous enough to pass constitutional muster." *Id.*, at 30, 142 S. Ct. 2111. The law must comport with the principles underlying the Second Amendment, but it need not be a "dead ringer" or a "historical twin." *Ibid.* (emphasis deleted).

602 U.S. at 691–92 (last alteration in original).

The Sixth Circuit has stated that

> [w]hile *Rahimi* followed *Bruen*'s mandate that courts examine our "historical tradition of firearm regulation," the case clarified the level of generality at which courts compare

7

> modern regulations with historical analogues. *See Rahimi*, 144 S. Ct. at 1897 (quoting *Bruen*, 597 U.S. at 17, 142 S. Ct. 2111). When courts engage in historical research, they don't need to find a perfect statutory analogue, rather we must ask whether the challenged regulation is "consistent with the principles that underpin our regulatory tradition." *Id.* at 1898. At the same time, as Justice Barrett noted, while the level of generality is relatively high, it must not be so high that it "waters down the right." *Id.* at 1926.

*United States v. Williams*, 113 F.4th 637, 645 n.2 (6th Cir. 2024).

### III. Analysis

Defendant argues that the indictment, which charges him with a violation of § 922(g)(5)(A), should be dismissed under *Bruen*. He argues that his "conduct as alleged in the indictment comes within the plain text of the Second Amendment." (ECF No. 38, PageID.121, 123.) He also argues that § 922(g)(5) is not consistent with the Nation's historical tradition of firearm regulation. (*Id.* at PageID.126.) The government disagrees. (ECF No. 40.)

#### A. The Second Amendment's Plain Text

Defendant argues that the Second Amendment's plain text covers his conduct as alleged in the indictment because (1) he is part of "the people" as that term is used in the Second Amendment, (2) the ammunition that is the basis of the § 922(g)(5)(A) charge is in common

8

use today, and (3) the plain text of the Second Amendment protects his specific conduct. (ECF No. 38, PageID.123–126.) The government only disputes that Defendant is part of "the people." (ECF No. 40, PageID.141–146.)

The Court finds it unnecessary to determine whether Defendant is part of "the people." The Court can resolve Defendant's motion by assessing whether § 922(g)(5)(A) is consistent with the Nation's historical tradition of firearm regulation.[4]

## B. Historical Tradition of Firearm Regulation

To meet its burden, the government must demonstrate that § 922(g)(5)(A) "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. The Court "must ascertain whether [§ 922(g)(5)(A)] is 'relevantly similar' to laws that our tradition

---

[4] Other courts presented with a *Bruen* motion challenging § 922(g)(5)(A) have resolved the motion based on the Nation's historical tradition of firearm regulation—without deciding whether the defendant is part of "the people." *See, e.g.*, *United States v. Serrano-Restrepo*, No. 2:24-cr-107, 2024 WL 4852233, at *5 (S.D. Ohio Nov. 21, 2024); *United States v. Escobar-Temal*, No. 3:22-cr-00393, 2023 WL 4112762, at *3 (M.D. Tenn. June 21, 2023); *United States v. Leveille*, 659 F. Supp. 3d 1279, 1283 (D.N.M. 2023); *United States v. Pierret-Mercedes*, 731 F. Supp. 3d 284, 294, 294 n.11 (D.P.R. 2024); *United States v. De Los Santos-Santana*, No. 23-311 (GMM), 2024 WL 98556, at *3 (D.P.R. Jan. 8, 2024); *United States v. Gil-Solano*, 699 F. Supp. 3d 1063, 1068 (D. Nev. 2023), *reconsideration denied*, No. 3:23-cr-00018-MMD-CLB, 2023 WL 8877809 (D. Nev. Dec. 22, 2023). The Court takes the same approach here.

is understood to permit." *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29).

Here, the government shows "relevant similarity" through the historical laws it identifies. The government references laws that disarmed individuals in certain groups who did not take a loyalty oath. The government asserts that "Massachusetts and Virginia . . . forbade the arming of Native Americans, and Virginia also prohibited Catholics from owning arms unless they swore 'allegiance to the Hanoverian dynasty and to the Protestant succession.'" (ECF No. 40, PageID.144 (quoting Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 157 (2007)).) "During the American Revolution, colonial governments disarmed those who refused to 'swear an oath of allegiance to the state or the United States.'" (*Id.* (quoting Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506 (2004); citing Cornell & DeDino, *supra*, 73 Fordham L. Rev. at 506 nn.128–29; Churchill, *supra*, 25 L. & Hist. Rev. at 159); *see id.* at PageID.148 ("[I]n Revolutionary America, legislatures often disarmed those . . . 'who

10

refused to swear their "allegiance and fidelity" to the state.'" (quoting *Range v. Att'y Gen.*, 69 F.4th 96, 125 (3d Cir. 2023) (Krause, J., dissenting), *cert. granted, judgment vacated sub nom. Garland v. Range*, 144 S. Ct. 2706 (2024); citing *United States v. Escobar-Temal*, No. 3:22-cr-00393, 2023 WL 4112762, at *5–6 (M.D. Tenn. June 21, 2023); *United States v. Leveille*, No. 1:18-cr-02945-WJ, 2023 WL 2386266, *4–5 (D.N.M. Mar. 7, 2023))).) *See United States v. Williams*, 718 F. Supp. 3d 651, 674–75 (E.D. Mich. 2024) (Levy, J.) (discussing historical laws involving disarmament and loyalty oaths), *rev'd and remanded*, No. 24-1244, 2025 WL 1089531 (6th Cir. Apr. 11, 2025).

A court in this circuit has noted that "several district courts held post-*Bruen* that § 922(g)(5)(A) is sufficiently analogous to the history and tradition of restricting the possession of firearms by those who refused to swear an oath of allegiance to the United States." *United States v. Serrano-Restrepo*, No. 2:24-cr-107, 2024 WL 4852233, at *8 (S.D. Ohio Nov. 21, 2024) (collecting cases) (concluding that historical oath-based restrictions are sufficiently analogous to § 922(g)(5)(A)).

Moreover, the Seventh Circuit recently determined that § 922(g)(5)(A) is "sufficiently analogous to many earlier firearm

11

regulations," including those that "conditioned the ability to possess firearms on one's loyalty to the sovereign" and "regularly disarmed [individuals] unless and until they swore an oath of allegiance." *United States v. Carbajal-Flores*, No. 24-1534, 2025 WL 1948914, at *8–9 (7th Cir. July 16, 2025). Regarding "the question of whether [§ 922(g)(5)(A)] conforms to our Nation's regulatory tradition," the Seventh Circuit stated:

> Congress, in passing the law, decided to prohibit any "alien" who "is illegally or unlawfully in the United States" from possessing a firearm. *Id.* We conclude that the provision sits comfortably alongside the line of firearm regulations that came before it. To see how, consider the two metrics courts use for assessing "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692, 144 S. Ct. 1889.
>
> We begin with "why" aliens have been precluded from possessing firearms then and now. . . . [G]overnments have consistently conditioned the right to bear arms on one's allegiance to the sovereign. Allegiance serves as a mark of trustworthiness. *See Kanter*, 919 F.3d at 457–58 (Barrett, J., dissenting). And it shows one's willingness to accede to the terms of social order in exchange for the full benefits of citizenship. Aliens, as a matter of their status, have not yet affirmed their allegiance to the sovereign. That has uniformly served as the basis for disarming them. It serves as the basis for § 922(g)(5)(A)'s prohibition, too.

> Compare also "how" governments have traditionally regulated firearms to how Congress has chosen to do so today. From the common law onward, aliens have historically been disarmed unless and until they swore an oath of allegiance to the sovereign. The way § 922(g)(5)(A) operates maps onto that tradition. The law precludes only illegal aliens—those who have necessarily forgone the naturalization process—from possessing firearms. But an alien who obtains citizenship by taking the oath of renunciation and allegiance, 8 U.S.C. § 1448, is entitled to keep and bear arms like every other law-abiding American. In other words, the same relief—pledging allegiance—exists today that has existed throughout history.

*Id.* at *8–9.

The Court finds persuasive the Seventh Circuit's analysis of § 922(g)(5)(A) under *Bruen* and *Rahimi*. The Court adopts that reasoning here. Furthermore, there is another way in which § 922(g)(5)(A) and the historical laws overlap in "how" they "burden . . . the right of armed self-defense," *Bruen*, 597 U.S. at 29: they both use the same tool—disarmament—to limit the right.

In sum, the loyalty oath laws in the historical record and § 922(g)(5)(A) impose a comparable burden on the right secured by the Second Amendment. The "why" and "how" behind the historical laws are analogous to the "why" and "how" underlying § 922(g)(5)(A).

13

Therefore, the historical laws and § 922(g)(5)(A) are relevantly similar. *See United States v. Pierret-Mercedes*, 731 F. Supp. 3d 284, 306, 308, 312–14 (D.P.R. 2024) (finding laws disarming Catholics and loyalists analogous to § 922(g)(5)(A)); *Rahimi*, 602 U.S. at 692 ("The law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" (quoting *Bruen*, 597 U.S. at 30)). Section 922(g)(5)(A) "fits within th[e] tradition" of firearm regulation, so "it is lawful under the Second Amendment." *Rahimi*, 602 U.S. at 691.

## IV. Conclusion

For the reasons set forth above, the Court DENIES Defendant's motion to dismiss the indictment. (ECF No. 38.)

IT IS SO ORDERED.

Dated: July 29, 2025　　　　　　　s/Judith E. Levy
　　Ann Arbor, Michigan　　　　　JUDITH E. LEVY
　　　　　　　　　　　　　　　　United States District Judge

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 29, 2025.

　　　　　　　　　　　　　　　s/William Barkholz
　　　　　　　　　　　　　　　WILLIAM BARKHOLZ
　　　　　　　　　　　　　　　Case Manager

14